IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| RUBÉN VÉLEZ-SEPÚLVEDA, <br><br> Plaintiff, <br><br> v. <br><br> GLAXOSMITHKLINE P.R., INC., <br><br> Defendant. | CIV. NO.: 13-1909(SCC) |

## OPINION AND ORDER

In this employment discrimination case, the defendant GlaxoSmithKline Puerto Rico, Inc., has filed a motion for summary judgment seeking to have the complaint against it dismissed. Docket No. 38. I grant the motion.

### 1.  Background

### 1.1 Preliminary Matters

Before delving into the facts, I want to comment on two general failings of the defendant's motion and the plaintiff's opposition that have affected the manner in which I consider

the facts below. First, Plaintiff Rubén Vélez-Sepúlveda has, as a general matter, neglected to follow the strictures of Local Civil Rule 56, which requires a party opposing a motion for summary judgment to "admit, deny or qualify the facts supporting the motion for summary judgment," and, in doing so, to "support each denial or qualification by a record citation." LOC. CIV. R. 56(c). Rather than follow this simple instruction, Vélez repeatedly states that the facts in a given paragraph "are disputed," *e.g.*, Docket No. 40-17, ¶ 26, without citing any basis whatsoever for that position. Inevitably, Vélez's unsupported denials fail, and the facts to which they respond are deemed admitted to the extent that they are supported by record evidence.

The local rules also permit a party opposing summary judgment to offer, "in a separate section" of their opposing statement of facts, "additional facts" which it supports by reference to the record. LOC. CIV. R. 56(c). Rather than include such additional facts as part of its opposing statement, however, Vélez chose to file a separate document—a self-signed sworn statement—that substitutes for an additional statement of facts. *See* Docket No. 40-1. Because the defendant managed to competently respond to this document, I will not strike it,

but I do note that it has caused the Court confusion and is an unnecessary complication of the standard summary judgment practice. Moreover, in many cases it proposes facts that could not possibly be within Vélez's personal knowledge, but which are not otherwise supported by record citations. *See, e.g., id.* ¶ 6 (referring to the defendant's outsourcing of certain matters to a third-party). I cannot credit such proposed facts. Likewise, I will not credit facts that purport to contradict facts that Vélez admitted by failing to properly oppose the defendant's statement.

Finally, although it responds to Vélez's sworn statement as if it were a counter-statement of material facts, the defendant does so by repeated reference to a meritless objection that deserves comment. As noted, Vélez filed a statement swearing to certain facts. The defendant purports to deny many of these facts on the grounds that Vélez's "statement is a self-serving, conclusory allegation totally unsupported by any corroborating evidence," *e.g.,* Docket No. 43-2, ¶ 2, as if this alone were reason to reject the facts proposed. Lest there be any doubt, it is not: witnesses associated with parties may—and routinely do—swear to affidavits for use during summary judgment. These affidavits are, almost by definition, self-serving; nonethe-

less, they are competent so long as they swear to facts in the affiant's personal knowledge. *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."). Of course, a different rule pertains when the affidavit contradicts previous testimony, *Colburn v. Parker*, 529 F.3d 325, 332 (1st Cir. 2005), but the defendant at no point accuses Vélez of having done this. Accordingly, any denials on these grounds are rejected, and the sworn facts shall be deemed admitted to the extent they are made on the basis of personal knowledge, are not otherwise objected-to, and do not contradict other admitted facts.

### 1.2 Factual Background

Plaintiff Rubén Vélez-Sepúlveda began working for Defendant GlaxoSmithKline Puerto Rico ("GSK") on August 15, 1991, and over the next two decades he occupied a number of different positions. Vélez acknowledges receiving various employee handbooks over the years. Docket No. 40-17, ¶ 2.

Beginning in 2005, Vélez began to show signs of hypertension and cardiac problems, which continue into the present. On January 11, 2011, Vélez suffered a major heart attack, and on

January 17, 2011, he underwent a quadruple bypass surgery. Due to this condition, Vélez was on medical leave from January 12, 2011, until April 12, 2011. During this time, he received short-term disability benefits. When Vélez returned, he satisfactorily performed all of his job duties until, on June 10, 2011, he again went on medical leave. Around this time, Vélez informed his supervisor that he had certain unspecified limitations.[1] Between January 12 and June 10, Vélez "never received a briefing from [GSK] regarding [his] options to perform [his] employment position." Docket No. 40-1, ¶ 5. This second period of leave lasted until June 20, 2011, and was a further result of Vélez's heart condition, which required him to have two angioplasties. After the worsening of Vélez's condition on June 10, 2011, he submitted SINOT[2] paperwork to Bonnie Branch, a GSK case manager.[3] During these periods of

---

**1.**  Vélez asserts that his supervisor never relayed this fact to human resources, but the basis for this knowledge is never stated. The fact is deemed denied.

**2.**  Puerto Rico's Non-Occupational Temporary Disability Insurance, commonly referred to by its Spanish-language acronym, SINOT. P.R. LAWS ANN. tit. 11, §§ 201–12.

**3.**  Vélez asserts that this paperwork was not processed by Triple S Vida, but he fails to support that fact by reference to the record. Accordingly,

absence, Vélez suffered stress because of delays in the payment of his benefits. When Vélez returned to work on June 20, 2011, it was "without restrictions." Docket No. 40-1, ¶ 9. On June 14, 2012, Vélez was informed that his Family and Medical Leave Act ("FMLA") leave had been exhausted.[4]

At some point in August 2011, while working in the field in Camuy with Rodríguez, Vélez became dizzy and unable to work. Rodríguez told him to go home. Two weeks later, Rodríguez mentioned the possibility of moving Vélez into a

---

it is deemed denied.

**4.**   GSK proposes three facts regarding a work performance evaluation that Vélez purportedly underwent on June 21, 2011. The first fact is, confusingly, phrased as proving that Vélez "alleged" something about that evaluation. Docket No. 38-2, ¶ 13. This fact is deemed denied because it is ambiguous whether GSK wishes to prove the underlying fact or just that Vélez *alleged* the underlying fact; if it's the latter, it has little value at summary judgment. The other two facts concerns the evaluation itself and are supported by a purported copy of the evaluation. *Id.* ¶¶ 14–15. But Vélez objects to the authenticity of this document, Docket No. 40-17, ¶¶ 14–15, and GSK has indeed failed to authenticate the document via affidavit or certification. Accordingly, the facts must be deemed denied. *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (holding that a "failure to authenticate" a document at summary judgment "precludes consideration of" that document); FED. R. EVID. 902(11) (requiring "a certification of the custodian or another qualified person" as a predicate to the authentication of business records).

less demanding position, but nothing ever came of it. That same month, Vélez's cardiologist, Dr. Edgardo Bermúdez, recommended that Vélez rest until November 2011, after which he could work half-days until February 2012.[5] Accordingly, Vélez requested further short-term disability ("STD") leave on August 24, 2011, after having requested medical leave on August 18. Vélez's STD request was forwarded to Branch. On August 31, 2011, Vélez was diagnosed with major depression, of which fact he informed Branch.

On September 30, 2011, Vélez met with Orlando Anglero and Jorge Rodríguez to discuss his options. Vélez asked Anglero about the possibility of receiving a severance package, and Anglero told Vélez that he did not see severance as an alternative. Vélez was thus told he should apply for long-term disability ("LTD") benefits, which, Anglero said, would represent more benefits in the long-run. Vélez requested such benefits on October 5, 2011. As part of Vélez's application, his

---

**5.**   Vélez purports to deny these facts on the grounds that the "dates do not correspond to reality." Docket No. 40-17, ¶ 17. And in fact, Vélez's deposition, on which GSK partially relies, does state somewhat different dates. *See* Docket No. 38-4, at 19. Due to this discrepancy, I deem the facts admitted as to the months, but not as to the particular days.

doctors certified that he was disabled and unable to work.[6] A few days later, he had a conversation with Branch about his options; she informed him that his STD benefits would exhaust soon and that he should send documentation regarding his LTD benefits quickly so that it could be processed. During the conversation, Vélez told Branch that he would be unable to return to work when his STD benefits elapsed, and that his physician had said he'd likely continue to be disabled.

As Branch had warned, Vélez's STD benefits ran out on November 9, 2011. Then, on January 4, 2012, the Hartford Company denied his request for LTD benefits. That month, Vélez communicated with GSK's human resources department regarding his dissatisfaction with the Hartford Company's decision. On January 23, 2012, for instance, Vélez sent a letter to Claire Thomas, GSK's director of human resources, requesting assistance on the grounds that the Hartford Company's

---

**6.** In his application, Vélez claimed a disability beginning January 12, 2011, but noted that his last day of work had been August 17, 2011. Docket No. 38-10, at 3. Crucially, Dr. José Pérez-Cardona, a cardiologist who treated Vélez when his condition flared up in August and who completed a statement of functionality as part of Vélez's initial application, stated that Vélez's expected return-to-work date was "undetermined." *Id.* at 7; *see also id.* at 8 (finding that the "[e]xpected duration" of Vélez's restrictions was "undetermined").

Case 3:13-cv-01909-SCC   Document 48   Filed 07/15/15   Page 9 of 26



VELEZ-SEPULVEDA v. GLAXOSMITHKLINE                                    Page 9


decision had been incorrect.

On January 31, 2012, Vélez was informed that his employ-ment reserve under SINOT had ended, and he was terminated. On February 1, 2012, Vélez's cardiologist, Dr. José Pérez-Cardona, sent a letter to the Hartford Company certifying that Vélez lacked the ability to work as a pharmaceutical sales representative.[7] Eventually, Vélez successfully appealed the denial of his LTD benefits, which he has been receiving since March 2012, retroactive to November 2011. These benefits amount to $5,595 per month, which works out to 60% of his salary, plus medical insurance paid by GSK.

Since his termination by GSK, Vélez has not sought other employment, as he is unable to work and cannot perform the essential functions of his former position.

---

**7.** Dr. Pérez's letter states that Vélez left work on August 17, 2011, because of an "inability to complete working duties," as well as "to prevent further progression of his extensive coronary artery diseases, and in view of [the] high risk of re-infarction." Docket No. 38-14, at 1. Dr. Pérez wrote that after Vélez was referred to his care in August 2011, he suffered an "intractable" heart condition that "persist[ed]" while Vélez was under his care. *Id.* Thus, despite showing mild improvement, Dr. Pérez concluded that as of February 1, 2012, Vélez was "still" unable to work. *Id.* at 1–2.

## 2.   Analysis

Vélez presses claims under the Americans with Disabilities Act, the Age Discrimination in Employment Act, and various Puerto Rico statutes. Below, I first resolve a dispute between the parties regarding Vélez's SINOT job reserve, and then I take up Vélez's claims.

### 2.1 SINOT Job Reserve

GSK's putative reason for terminating Vélez was that his SINOT job reserve—the period of time in which an employer must reserve a temporarily-disabled employee's job—had run out. Vélez argues that, to the contrary, the reserve had not run out when he was terminated. Although I see nothing in the ADA that would make the propriety of Vélez's termination turn on the correct computation of the SINOT job reserve,[8] I address the issue because the parties have spent significant time with it in their briefs.

---

**8.**   As I explain below, after leaving work for the last time in August 2011, Vélez was never again healthy enough to work. His ADA claim fails for this reason alone. Of course, terminating Vélez before his SINOT job reserve expired would constitute wrongful termination under Puerto Rico's Law 80, P.R. LAWS ANN. tit. 29, §§ 185a–185m. *See Gonzalez-Villanueva v. Warner Lambert*, 339 F. Supp. 2d 351, 361 (D.P.R. 2004). But Vélez's complaint does not state a cause of action for violations of SINOT or Law 80.

Pursuant to SINOT, when an employer becomes temporarily disabled, the employer must "protect the employment position held by" the employee "at the onset of the disability" for a period of one year plus fifteen days from the onset date. P.R. LAWS ANN. tit. 11, § 203(q)(1). Moreover, the employer's duty to reinstate the employee is not activated unless the employee "petition[s] the employer to be reinstated." *Id.* Of course, the employee must also be "mentally and physically capable" of performing his job duties at the time he requests reinstatement. *Id.* § 203(q)(2).

The onset of Vélez's condition was January 12, 2011, when he first took medical leave as a result of his heart attack. *Laracuente Santiago v. Pfizer Pharm.*, 160 D.P.R. 195 (P.R. 2003) ("Ordinarily, the employment reserve begins to run on the date of the accident. This is based on the common experience that the worker who suffers a serious accident is disabled by that same accident." (translation by the Court)). Using this onset date, Vélez's job reserve would have expired on January 27, 2012. He was terminated on January 31, 2012, outside of this reserve period. Citing two Puerto Rico Supreme Court cases, Vélez argues, that his re-hospitalization in June 2011, during which time he had two angioplasties, constituted an "inter-

current" condition entitling him "to a new job reserve under" SINOT. Docket No. 40-16, at 7–8. Neither case Vélez cites come close to supporting such a proposition.

Vélez first cites *Vélez v. Comisión Industrial de P.R.*, 91 D.P.R. 480, 91 P.R.R. 466 (P.R. 1964). In that case, an employee suffered a work place injury and, while in the hospital being treated, suffered a second, fatal injury. 91 P.R.R. at 468–69. The issue before the Court was whether Puerto Rico's workers' compensation statute—not SINOT—covered the employee's death. The Court held that it did, on the grounds that an injury occurring in the course of treatment for a compensable injury is itself compensable. *Id.* at 471. Given that the worker had died as a result of injuries, the Court of course said nothing about the employer's obligation to hold open his position.

Vélez also cites *Rivera Rivera v. Comisión Industrial de P.R.*, 100 D.P.R. 363, 100 P.R.R. 362 (P.R. 1972), which is also a workers' compensation case. There, the employee, who had been determined partially disabled, suffered another injury which the Industrial Commission determined to be "intercurrent." 100 P.R.R. at 363. The Court explained that an intercurrent accident "*is*" a "compensable sequel." *Id.* at 364 (emphasis added). It went on to explain that to be compensa-

ble, the second injury—whether it "be an aggravation of an existing [injury] or a different one—must be "a natural or a direct result of a primary compensable injury." *Id.* Thus, an intercurrent accident is a secondary injury that flows naturally from a prior injury covered by the labor law.[9] At no point does *Rivera Rivera* discuss job reserves; much less does it suggest that a worker suffering an intercurrent injury is entitled to a new reserve beginning on the second injury's date.

Indeed, *Rivera Rivera*'s logic would suggest to the contrary: if an intercurrent injury is a natural result of the primary injury, and compensable on that basis, why would it restart the job-reserve clock? Unsurprising, then, that the Supreme Court has held that employment reserve periods are not subject to tolling or interruption. In *Torres González v. Star Kist Caribe, Inc.*, the Supreme Court considered whether the workers' compensation act's job-reserve period was tolled during periods in which the State Insurance Fund authorized the employee to work despite being under continuing medical treatment. 134

---

**9.**   This is perhaps at odds with the natural definition of "intercurrent," which would seem to suggest an intervening injury, not a foreseeable one. *See, e.g.*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 848 (28th ed. 1994) ("breaking into and modifying the course of an already existing disease").

D.P.R. 1024, 1027–28 (P.R. 1994).[10] The Court noted that the plaintiff had not had an intercurrent condition;[11] instead, she had returned to work while healing from her initial injury. *See id.* at 1033. The Court went on to state that the "temporary return of an employee to his position does not interrupt the" job-reserve period. *Id.* at 1035. Stronger still, the Court, writing in italics (to which the English translation adds bold), stated that the job-reserve period was one of caducity that "cannot be interrupted in any way."[12] *Id.* at 1036.

---

**10.** An English-language translation of *Torres González* is available on Westlaw at 1994 P.R.-Eng. 909,600.

**11.** *Torres González* is opaque as to what, if any, analytical force this determination had, but nothing in *Torres González*—or any other case that I can find—suggests that a different result would have obtained had the plaintiff's injury been intercurrent. To the contrary, the absolute language used by the Court in describing the job-reserve period suggests that it would not have. *See Laracuente Santiago v. Pfizer Pharm.,* 160 D.P.R. 195 n.12 (P.R. 2003) (reiterating that the workers' compensation job-reserve period "is one of caducity that cannot be interrupted *in any way*" (emphasis added; translation by the Court)).

**12.** The official English-language translation renders the Spanish phrase "*[e]ste período es uno de caducidad*"—literally, "this period is one of caducity"—as "[t]his period expires by the lapse of time." In doing so, it fails to capture the original's forcefulness. Under Puerto Rico law, a period of caducity—unlike a period of prescription—can never be tolled. *Ortega Candelaria v. Orthobiologics LLC,* 661 F.3d 675, 678 n.4 (1st

*Torres González* concerned the workers' compensation statute, but there is every reason to think that its holding applies with equal force in the SINOT context. In fact, the *Torres González* Court itself made this connection, noting that SINOT's job-reserve provision "is almost identical to" the workers' compensation law's. *Id.* at 1035–36. Thus, given the established fact that Vélez's disability is related to heart problems that go back to 2005, and which first required him to leave work in January 2011, there can be no doubt that his SINOT job reserve began to run when he first left work on January 12, 2011, that it was never interrupted or renewed, and that it expired prior to his January 31, 2012, termination.

---

Cir. 2011); *R.P. Farnsworth & Co. v. P.R. Urban Renewal & Hous. Corp.,* 289 F. Supp. 666, 669 (D.P.R. 1968) ("Caducity periods admit no interruption."). Once a caducity period expires, "all obligations are completely extinguished." *Prime Retail, L.P. v. Caribbean Airport Facilities, Inc.,* 975 F. Supp. 148, 153 (D.P.R. 1997); *Ruiz v. Ambush,* 25 F. Supp. 2d 211, 213 (D.P.R. 2014) ("In other words, lapse of time extinguishes the right to a cause of action precluding even judicial tolling."); *R.P. Farnsworth,* 289 F. Supp. at 669 ("Once the caducity period has elapsed the cause of action is barred forever."). Periods of caducity are thus similar to the common law concept of statutes of repose. *See CTS Corp. v. Waldburger,* 134 S. Ct. 2175, 2183–84 (2014) ("Statutes of repose . . . generally may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control.").

## 2.2 The Americans with Disabilities Act

Vélez's complaint alleges that GSK violated the ADA by terminating him on account of his disability. To prevail on a claim under the ADA, a plaintiff must prove: (1) that he was disabled within the ADA's meaning; (2) that he could perform his job's essential functions with or without reasonable accommodation; and (3) that he was discharged on account of his disability. *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000). GSK argues that Vélez's claim must fail because he cannot prove that he was able to perform the essential functions of his job.

Vélez bears the burden of proving that, at the time he sought to resume his job, he could perform its essential functions. *Id.* at 646–47. Similarly, Vélez bears the burden of proving that he made a "sufficiently direct and specific" request for accommodation, explaining "how the accommodation requested is linked to some disability." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir. 1992); *see also Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102–03 (1st Cir. 2007) (following *Wynne*).

Vélez left work for the last time in August 2011. He was terminated in January 2012. Between these dates, the event that

could be best construed as a reasonable accommodation request is Vélez's submission, in August, of a recommendation from Dr. Bermúdez that Vélez take several months of leave followed by a return to part-time work in November 2011. But when November rolled around, Vélez did not request to return to work. Instead, he had by that time applied for LTD benefits, claiming total disability. As part of his application for LTD benefits, Vélez's doctors certified that he was unable to work.[13] Vélez had moreover told Bonnie Branch, during a conversation in October 2011, that he would most likely be unable to return

---

**13.** Vélez cites *Cleveland v. Policy Management Systems Corp.* for the proposition that receipt of disability benefits does not automatically preclude a person from making an ADA reasonable accommodation claim. Docket No. 40-16, at 19 (citing 526 U.S. 795 (1999)). *Cleveland* does so hold but clarifies that "to survive a defendant's motion for summary judgment, [the plaintiff] must explain why" his contention of disability "is consistent with [his] ADA claim that [he] could 'perform the essential functions' of [his] previous job." 526 U.S. at 797–98. Vélez fails to do this: he applied to LTD benefits in October 2011, and he was eventually awarded benefits retroactive to November 2011. Furthermore, the record reveals that after August 2011, he was never healthy enough to return to work. More to the point, I have not applied preclusion principles; rather, I have simply relied on evidence gleaned from Vélez's disability application. Statements of inability to work included as part of an application for disability benefits can be used as evidence that a person was not a qualified individual under the ADA. *August v. Office Unlimited, Inc.,* 981 F.2d 576, 581 (1st Cir. 1992).

to work when his STD benefits elapsed in November, as his doctor had said that he'd probably continue to be disabled.

Thus, to the extent that Vélez had made a direct and specific request in August 2011, by the time his proposed return-to-work date rolled around, the signals were decidedly more mixed. If anything, intervening events had neutered the request entirely: by November 2011, Vélez was claiming long-term disability, complete with medical certificates, and was not seeking to return to his job. Given that Vélez never asked to return to work—because he was never again (as he is not now) healthy enough—GSK cannot be said to have violated the ADA by not employing Vélez half-days starting in November; there was simply no sufficiently clear and direct request for accommodation on which GSK could act. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (finding no ADA violation where "during her leave of absence" the plaintiff had "never made a request to return to work and never requested any kind of accommodation"); *Cash v. Siegel-Robert, Inc.*, Civ. No. 10-2736, 2012 WL 3683466, at *13 (W.D. Tenn. Aug. 24, 2012) (similar), *aff'd*, 548 F. App'x 330 (6th Cir. 2013); *Roberson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 582 (M.D. Tenn. 2002) ("If the employee never requests to

return to work, for an extension of leave, or for some kind of accommodation, the employer does not violate the ADA by terminating her."); *Daddazio v. Katherine Gibbs Sch., Inc.*, Civ. No. 98-6861, 2012 WL 228344, at *5–6 (S.D.N.Y. April 20, 1999) (similar).

Eventually, of course, GSK terminated Vélez because he had not returned to work in the time that Puerto Rico law required GSK to hold his position. In some cases, it can violate the ADA to terminate—rather than provide additional, uncompensated leave to—an employee after statutory leave expires. *Garcia-Ayala*, 212 F.3d at 649–50. This is not such a case, however, because Vélez never requested additional, unpaid leave; instead, he sought LTD benefits.

The bottom line is that Vélez's ADA claim must fail because there is *nothing* in the record to suggest that after he left work for the last time in August 2011 he was ever again sufficiently healthy to return to work, with or without an accommodation. *Cf. August v. Offices Unlimited, Inc.*, 981 F.2d 576, 580–81 (1st Cir. 1992) (dismissing ADA claim where "the record [was] . . . fatally bereft of indication that [the plaintiff] possessed the ability to perform his job"). For this reason, Vélez cannot be deemed a qualified person under the Act, and summary

judgment must be granted in GSK's favor.[14] Summary judg-
ment must also be granted as to Vélez's claim under Law 44,
P.R. LAWS ANN. tit. 1, § 501, Puerto Rico's state-law analogue
to the ADA. *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 87
(1st Cir. 2008) ("Because Law 44 and the ADA are coterminous,
we affirm the District Court's dismissal of both regarded as
claims.").[15]

---

**14.** The same result would obtain if the mention of moving GSK to a
different position were treated as a reasonable accommodation request.
Furthermore, an employer is "not required to find another job for an
employee who is not qualified for the job he or she was doing." *School
Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 289 n.19 (1987).

**15.** Vélez's complaint does not state an ADA retaliation claim, but
opposition to the motion for summary judgment gestures towards such
a claim by calling certain activity protected. Docket No. 40-16, at 7. To
the extent such a claim has been stated, however, summary judgment
would be appropriate on account of Vélez's failure to show pretext.

Vélez also spends significant time alleging that GSK failed to
properly engage in the ADA-required interactive process. To the extent
that an interactive process claim even exists under the ADA, it is
"subsidiary" to the plaintiff's reasonable accommodation claim. *Tobin
v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 n.7 (1st Cir. 2005). Because
Vélez's reasonable accommodation claim fails, "the interactive process
claim necessarily fails as well." *Negron-Marty v. Wal-Mart P.R., Inc.*, 862
F. Supp. 2d 48, 63–64 (D.P.R. 2012).

### 2.3    The Age Discrimination in Employment Act

Vélez also brings a claim under the Age Discrimination in Employment Act ("ADEA"), which prohibits employment discrimination against workers over the age of 40 on account of their age. 29 U.S.C. §§ 621–34. The ADEA borrows Title VII's burden-shifting framework where, as here, the plaintiff lacks "smoking gun" evidence of age discrimination. *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 446–47 (1st Cir. 2009). To state a prima facie case, the plaintiff must prove: (1) that he was 40 or older; (2) that he was qualified for his job; (3) that he was terminated; and (4) "the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services." *Id.* at 447. If a plaintiff makes his prima facie case, the "burden of production then shifts to the employer 'to articulate a legitimate, non-discriminatory reason for its decisions.'" *Id.* (quoting *Arroyo-Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 219 (1st Cir. 2008)). And if the employer "articulates such a reason," the framework dissolves and the plaintiff must prove pretext. *Id.* Moreover, the plaintiff must prove that age was the "'but-for' cause of the employer's adverse action." *Gross v. FBL Fin Servs., Inc.*, 557 U.S. 167, 176 (2009); *see also Valle-Santana v. Servicios Legales de P.R., Inc.*, Civ. No. 12-1506(SCC), 2014 WL

4215543, at *2 n.5 (D.P.R. Aug. 24, 2014) (explaining that *Gross* imposes "a harder burden than exists under Title VII").

Vélez fails to make a prima facie case of age discrimination. First, he is not a qualified individual for the purposes of the ADEA. As explained above, it is undisputed that after he left work in August 2011, Vélez was never again healthy enough to work. *See Detz v. Greiner Indus., Inc.*, 346 F.3d 109, 119 (7th Cir. 2003) ("To be 'qualified' [under the ADEA], a plaintiff must have been performing his job at a level that met his employer's legitimate expectations at the time of his discharge." (internal quotations omitted)).  Accordingly, he could not be qualified for his position for ADEA purposes. *Cf. id.* (holding that a person cannot be simultaneously disabled for the purposes of Social Security and qualified under the ADEA). Moreover, Vélez has offered no evidence suggesting that his position was filled after he left. Summary judgment in GSK's favor would be proper on these grounds alone.

But even if Vélez made his prima facie case, summary judgment would be required because the record is devoid of evidence of pretext. In its statement of uncontested facts, GSK proposes that Vélez "allege[d] that during" a meeting with Anglero, Anglero told Vélez that he "was coming to a new way

of doing business, totally different and that all [Vélez's knowledge] was outdated and must forget all about it." Docket No. 38-2, ¶ 23. Of course, this statement, read literally, *does not* propose that Anglero actually made that comment; it proposes only that Vélez *alleged* it, which is a very different thing.[16] And Vélez's own sworn statement mentions no age-discriminatory comments whatsoever. Tellingly, Vélez's opposition to GSK's motion for summary judgment does not even respond to GSK's ADEA arguments.

For these reasons, I grant GSK's motion for summary judgment with regard to Vélez's ADEA claim.

### 2.4 Articles 1802 and 1803 of the Puerto Rico Civil Code

Vélez also brings claims pursuant to Puerto Rico's general negligence statutes, Articles 1802 and 1803 of the Civil Code, 31 P.R. Laws Ann. tit. §§ 5141–42. As a general matter, however, resort may not be made to Articles 1802 and 1803 where a more

---

**16.** The result would not differ had such a comment been made. Nothing in the record suggests that Anglero was a decisionmaker, and he made a single, ambiguously discriminatory comment. This would not suffice to establish pretext. *Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir. 2007).

specific statutes deals with the conduct complained of.[17] *Pagán Colón v. Walgreens of San Patricio, Inc.*, 190 D.P.R. 251, 260 (P.R. 2014) ("[W]hen this Court has construed a special labor . . . law in the context of the remedy sought, it has been consistent in construing the statute restrictively. That is, we have refused to accept the thesis that the lawmaker left the door open to any other relief or cause of action provided by a general statute."

---

**17.** Beginning with Judge Cerezo's opinion in *Rosario v. Valdes*, the judges of this district have tended to view the Puerto Rico Supreme Court's opinion in *Santini Rivera* as requiring this result. *See Rosario v. Valdes*, Civ. No. 07-1508(CCC), 2008 WL 509204, at *2 (D.P.R. Feb. 21, 2008) (citing *Santini Rivera v. Serv. Air, Inc.*, 137 D.P.R. 1 (P.R. 1994)); *see also Morell v. HP Corp.*, Civ. No. 14-1123(PAD), 2015 WL 1022280, at *3 (D.P.R. Mar. 9, 2015) (Delgado-Hernández, J.); *Irizarry-Santiago v. Essilor Indus.*, 982 F. Supp. 2d 131, 140 (D.P.R. 2013) (Besosa, J.); *Reyes-Orta v. Highway & Transp. Auth.*, 843 F. Supp. 2d 216, 227 (D.P.R. 2012) (Casellas, J.); *Medina v. Adecco*, 561 F. Supp. 2d 162, 176 (D.P.R. 2008) (Gelpí, J.). However, in a 2012 opinion the First Circuit called Judge Cerezo's conclusion into question, implicitly holding that *Santini Rivera* was not so clear that a holding contrary to *Rosario*'s constituted plain error. *Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, 671 F.3d 49, 58 (1st Cir. 2012); *see also Campos v. Safety-Kleen Sys., Inc.*, Civ. No. 12-1529(PAD), 2015 WL 1608068, at *12 n.9 (D.P.R. Mar. 31, 2015) (noting that the First Circuit had "noted but declined to discuss" the *Rosario* issue). Any doubts raised by *Muñoz* have been settled by the Supreme Court's recent decision in *Pagán Colón*.

(emphasis omitted)).[18] Articles 1802 and 1803 may be invoked, however, when based on conduct "distinct from" that covered by the specific statute that is "nonetheless tortious or negligent." *Santini Rivera v. Serv. Air, Inc.*, 137 D.P.R. 1, 16 (P.R. 1994) (Hernández-Denton, J., concurring).[19]

Here, Vélez, in his opposition to the motion for summary judgment, fails to point to any allegedly-negligent conduct separate from that covered by the specific labor laws. To the contrary, Vélez argues that GSK "incurred in gross negligence by the omission to entertain the reasonable accommodation request." This is precisely the type of claim covered by Puerto Rico's labor laws. I thus grant summary judgment dismissing Vélez's Articles 1802 and 1803 claims.

---

**18.** The Supreme Court's opinion in *Pagán Colón* answered a certified question posed by the First Circuit in *Pagán-Colón v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, 19 (1st Cir. 2012). An official English-language translation of the Supreme Court's opinion can thus be found in the First Circuit's docket for that case. PUERTO RICO SUPREME COURT OFFICIAL TRANSLATION OF ITS FEBRUARY 14, 2014 OPINION, *Pagán-Colón*, No. 11-1089 (1st Cir. filed Oct. 20, 2014).

**19.** An English-language translation of Chief Justice Hernández-Denton's concurrence in *Santini Rivera* can be found on Westlaw at 1994 P.R.-Eng. 909,527.

### 3.  Conclusion

For the reasons discussed above, GSK's motion for summary judgment, Docket No. 38, is GRANTED. Judgment will be entered dismissing Vélez's complaint with prejudice.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 15th day of July, 2015.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE